This case this morning is UNILOC v. MICROSOFT, Mr. Dunner. Good morning, and may it please the Court. This case is a classic case of the improper use of the J-MOF procedure and the new trial procedure. The district court found that the jury lacked a grasp of the issues. Mr. Dunner, I've been here before and found it one of the more difficult decisions of my judicial career when you think the jury has made a mistake, at least as one of ordinary skill would view the issue, but the standard is no reasonable juror. How do you reconcile if you're, I'm putting you in a difficult position here, you're the trial judge, you're convinced that no one of skill in the art would see it this way, but the jury has. What do you do? Your Honor, the test is whether there is substantial evidence so a reasonable juror could find the party. And that is the test. The test is not whether one skill in the art would like it or not. So you're going to allow a mistake to happen. You know that if anyone of scientific ability looks at this question, they're going to say, no way it could be that way. In this instance, that is too complex an algorithm to be a summation. And anyone of skill in the art looking at that is going to say the same. And you're going to allow that to happen as the district judge? I have two answers for you, Your Honor. One is that that's the law. The law is it's a small amount of evidence. Is there substantial evidence so a reasonable juror could find it? And the fact that one skill in the art might have viewed it differently, the fact that the judge might have viewed it differently, is irrelevant. We had here a jury that's almost like a blue ribbon jury. Nine of them had college education. Several of them had more than a basic bachelor's degree. That's the jury I overruled once myself on the same situation. You know that story, but stick with this one. Why wouldn't I still say I'm going to not allow this jury to make a mistake? Your Honor, because I think that, first of all, I think that is not the law. The law is a substantial evidence rule. And moreover, in this case, I think no reasonable judge could have reached the conclusion based on the evidence. I have a two-pronged argument. One is the judge said the evidence was lopsided in favor of Microsoft. I submit, Your Honor, it was lopsided in favor of Unilock. We had their expert running away from document after document by Microsoft on the summation issue, the infringement issue. They said this is a summation algorithm. This is a summing algorithm. This is a checksum. He was confronted with those documents, and he had to say that was great. But those were documents that were kind of with a different context, weren't they? They were trying to simplify this and make it seem easier in the context of whatever engineering discussions they were having. This wasn't a question of whether one of skill in the art would call this a summation algorithm. It's a matter of science. We not only had those documents, which I certainly think contributed heavily to the substantial evidence test, but we had Mr. Klausner, the expert of Unilock, who, while he was precluded from giving a bottom line on the question of the summation algorithm, he provided ample testimony going into great detail as to how the systems worked, what they did, the fact that summing was involved. There was a heavy and direct conflict between Microsoft's expert and Unilock's expert. But, you know, there's circular shifting, there's scrambling, there's logic operations. None of that's addition. Those are just three facets of this problem. Unilock's expert said it was addition. He said that the scrambling and the other features involved multiplication, which was iterative addition. He hit those issues head on, and the jury could reasonably have relied on his testimony on that issue, coupled with the fact that Microsoft's expert had to run away from all the contemporaneous documents that Microsoft generated. Now, the court said that, no, the test is, it's a simple combination of inputs by addition, which relates to the point you just made, Your Honor. The fact is that he gave a general instruction. He interpreted LUID, generating means, as a summation algorithm, a summer, or their equivalents. And after trial, after trial, in the JMO phase of the trial, he suddenly put a gloss on that, and he said it has to be a simple combination of inputs by addition. There are two answers to that. First of all, the case law says you can't suddenly change the definition at the JMO proceeding from what you did when you instructed the jury. That's one point. And the second point is that the patent nowhere talks about simple combinations. In fact, even the material he relied on in the patent, I think it's figure 8 in column 7, talks, involves alphanumeric numbers that have to be converted to binary numbers. In fact, the algorithm isn't on figure 9, Mr. Dunner, and if you have figure 9 handy, it shows you adding the product name plus the customer information plus the serial number. Well, product name would certainly be alphanumeric, wouldn't it? I mean, you'd have to, this is, in fact, the figure that articulates what is called the summation algorithm in the patent. It's referred to it directly, and product name would be alphanumeric. So, of course, the summation algorithm would have to involve converting that into a number so it could be added, right? Exactly. It has to be converted into binary numbers. And that's part of the summation algorithm. That's part of the summation algorithm. And it's for the jury to decide whether something is too complex or more complex or less complex. And in this case, the judge didn't permit the jury to do that. Now, I omitted one point, and that is the whole summation point, we suggest, is precluded by the mandate rule. That issue was one of three alternative questions raised by Microsoft in what we call Unilock 1, which was the first appeal. And they say, well, the evidence was different. Well, the evidence, there was more evidence at the trial, not less evidence, but it was very similar evidence. We had Klausner not giving a bottom line in either case and talking about the fact that summation was involved. And we have the same plus more documentary exhibits calling this summation, calling MD5 and SHA1 summation algorithms. I submit that going back to your first question, Your Honor, even if one could want to rule against what the jury did because the evidence was so overwhelming in one direction that one felt compelled to do it, this is not that case. And so… If you don't mind, could I turn you over to the issue of damages? Your Honor, absolutely. There's a new trial that was granted on damages in light of the experts, Mr. Gemini… Gemini. Gemini, okay, as opposed to the cricket. Got it. So he did what was referred to as a check to determine whether the number he produced was in fact reasonable. Yes. But how do we know that the jury didn't rely on this in order to come up with their $388 million verdict? It seems to me when reading the testimony it's as though you have two alternatives presented, one that apparently would logically be or legally be appropriate, a valuation-based approach, and then a second one which is simply an entire market value type application. So why aren't we to be concerned and why isn't a new trial warranted in light of the fact that he testified on entire market value rule when we all agree there's no evidence of customer basis for demand, so he shouldn't have done that? There are multiple answers to that. First of all, Lucent v. Gateway makes it clear that he didn't use the entire market value rule, but if he had, Lucent v. Gateway says that if the royalty rate is low enough, then you could refer to total revenues. Lucent v. Gateway says that expressly. But that has to take into account things like demand and value added to the overall product. And as I read the testimony here, those factors weren't really discussed or presented or considered. This was just sort of a check which was a gloss on the overall royalty based on the overall amount of sales. Your Honor, I don't agree with that. I'll answer your question and then I'd like to come back to Judge Morrison. The truth is he wanted to get the $19 billion figure out there, didn't he? Your Honor, it is a common procedure for somebody to use a check. We had a pie chart. Microsoft never objected to the pie chart. I've met this particular expert witness as a trial judge. Same tactic.  Your Honor, in this case, he expressly—I'm sort of torn between three questions. You sure are. He's the chief judge. Let's stick with my question. Then we'll move to yours. I've been overruled, Judge Morrison. I've been overruled often, so don't feel bad. The fact is that it is a common procedure to use a check. Mr. Gemini expressly told the jury on 2258 that he was not basing his opinion off of the 19.27. He wanted to get the $19 billion in front of the jury, didn't he? And the district court said it was okay to talk about the check. He said it was all right. And Microsoft never objected to the pie charts on the check. But the district court had instructed them to stay away from the $19 billion. Your Honor, if you can find that, perhaps Mr. Schorkenbach can point you to where it is. We don't know where that is in the record. He did not tell them to stay away from the $19.27 billion figure. And, in fact, at 3183, he basically said, I don't want you to talk about entire market value, which the witness did not talk about, but you can talk about the check. And the judge let him talk about the check. And the witness, this is coming back to Judge Lynn. I'm sort of confused as to why I'm asking you that. That's good, because I'm about to ask you a follow-up, so go ahead. Well, please don't until I answer the first question. The witness basically testified. He used an appraisal. It was a Microsoft appraisal. It was $10 to $10,000 per application for the product key. He recognized that the product key had other applications other than this particular invention. So he conservatively took the low end of that estimate. He basically talked about how he arrived at this. But that doesn't have anything to do with the check. That is what we've all said. No one is objecting to the propriety of that method of development. Your Honor, I thought Judge Lynn's question related to what I was just answering. You're right. This has nothing to do with the check. But let me just finish this. Well, that was where my follow-up was. Is it, in your opinion, is it proper to present as just a check a theory of damages that might not otherwise be proper? Yes, as long… So as one could come in with, you know, we have a theory of damages based upon a reasonable royalty for this particular invention, etc., etc., and we come up with a number of $500 million. Now, just to see whether that's okay, let's just take the total sales revenue, $19.27 billion, and let's multiply it by 5% because 5% is a nice number. There are lots of licenses that are at 5%. And we come up with $800 million or whatever the multiplication might be. I would say, well, that's a lot higher than my actual calculation. So that means the actual calculation must be reasonable. Is it proper just to pull a number out of thin air? And you get to do that with whatever taint comes with it just by calling it a check. Your Honor, there are, again, multiple answers to that, and this fades into Judge Brewer's question. It is proper as long as you do several things. One, as long as you make it clear what your calculation is based on, and here Mr. Gemini did that. He used the $10 figure of the appraisal. He used the 25% rule of thumb figure. He used Georgia-Pacific factors, and he ended up with $2. All of that is with respect to the, for lack of a better expression, the legitimate theory of damages that was presented. But then you come up and say, all right, just to make sure that the legitimate theory comes up with the right number, a reasonable number, we'll do a little bit of a check. And you come in with something that is totally inappropriate. Your Honor. Is that okay? It is not inappropriate. If it was. If it was. If it was inappropriate. Would it have been okay to have introduced? Well, the First Circuit rule says. Not the First Circuit. No, but on this procedural issue, I think the First Circuit rule applies. The First Circuit rule says if there's no objection, then it's proper. You can't use it as a basis for a new trial. Assume there was an objection now. Pardon? Now assume there was an objection. Assume there was an objection. Well, if there was an objection and the judge said, don't do it, and then the lawyer did it, then that can be taken into account in determining whether there's a new trial. In this case, the judge did not say, we cannot find any place where the judge says, don't refer to the 19 point plus billion dollar figure. In fact, on the contrary, on 3183, he said, you can question about the check sum. He just said, stay away from the entire market value rule. And the witness never referred to the entire market value rule. There was one point where counsel did it, and the judge corrected him and said, don't do that. And so that part is okay. But here, one, there was no objection. Two, I think it is proper to use a check. As long as you make it clear to the jury that you're not relying on it, and the judge admonished the jury himself in his jury instructions and said, don't rely on the total value. And you think it's proper to use as a check a theory of damage use that might otherwise not be proper? As long as you make it clear to the jury, first of all, as long as you make it clear to the jury what you're doing, and as long as you make it clear to the jury what your damage theory is based on. Just as a double check, let me give you the theory that would not hold up and would not be otherwise proper, but it's okay, consider it just as a check. How does that make it any better? Your question presupposes, maybe you don't intend it to presuppose, but presupposes that it's wrong to use it as a check. I submit it is not wrong to use it as a check, so long as you make it absolutely crystal clear to the jury that you're just using it as a check. I submit there's nothing wrong with it. But, Mr. Donnerly, they didn't just use it as a check, they also used it to attack Microsoft's damages figures. To do what? To attack Microsoft's damages theory, throwing in the comment that it's nuts to multiply $22 billion by... In his closing argument, Mr. Donnerly did say that. And that's not just a check anymore, that's an affirmative argument to discredit a more reasonable damages figure, isn't it? Well, again, you could reasonably tie that to the same check argument. We never made... But it's not checking your own figures anymore, you're attacking theirs and thus setting your own up as an alternative. It's pretty hard to call that a check, isn't it? Your Honor, I think it's related to the check that Mr. Gemini did. Mr. Donner, now, one of the things that Mr. Gemini testified to was he compared the 2.9% number to what he said average licenses in the software industry were between 10 and 11.5%. Yes. So where in the world did he get off with the 25% rule of thumb when his own testimony is average software licenses are between 10 and 11.5%? Well, he was taking a conservative approach. No, 25% is not conservative if the average license is 10 to 11.5%. He gave no basis for this 25% other than it's a rule of thumb that you can use in any industry. Your Honor, what he did was he started with the appraisal. The appraisal had a lower number of $10. And so because it went from $10,000 to $10,000, he wanted to be conservative. So we used the lowest number. He was conservative on that part. Fine. I agree with you. He was conservative on that. But why does he then get to choose a percentage that bears no relation to the facts of this industry? Well, because he thought $10 bore a relationship to this invention. And he chose $10 for that reason, but why 25%? But then he took one quarter of it using the 25% rule. What 25% rule? There's nothing in this industry that justifies a 25% royalty rate. And his own testimony is that the royalty rate, based on all the statistics available to him, is between 10 and 11.5%. Your Honor, it's not a 25% royalty rate. The 25% rule is you take 25% of the value and you take 25% for the patent owner and 75% for the other party. So why is that not a royalty rate? That's 25% of the value of what you contributed in the form of a licensing rate. That's exactly what it is, 25%. It's one quarter. Yes. It's one quarter of the value. Right, but one quarter of the value of the average licensing rate in the software industry, by his own testimony, is 10 to 11.5%. It seems unfounded. So he's being conservative. He's going well below 10 to 11.5%. Your Honor, the 25% rule is not the royalty rate. You figure out what... These are apples and oranges, I submit. You're talking about two different things. You're talking about what is the value of the invention to a party. And then you take 75% of it. This isn't the royalty rate. You take 75% of it and you leave it to the party. And then you take 25% of it and you give that to... That's your starting point. Is this a lost profits case? No, it's not a lost profits. It's a reasonable royalty case. So then tell me, what is the percentage reasonable royalty that was determined in this case by your expert? $2.50 per activation. Per $10 product. $2.50 per $10 product. How is that not 25%? Your Honor, I don't know what the value of the product is. If the value... Your expert valued it $10. Okay. Okay. Well, Mr. Dunham, I need to call this to a close here. What we'll do is we'll give you your three minutes of rebuttal time back. And would you give Mr. Schirkenbach an additional five minutes if he needs to use that? Thank you, Your Honor. Good morning. Please support. I had intended to talk initially about the direct infringement issue. Why did you start there? Because I do think that's the one that requires maybe a little bit of clarification after I read the reply briefs. This is a dispositive issue. It's actually undisputed at this point. It's a legal issue. And it's an additional reason Microsoft wins. It turns on the construction of Claim 19 and whether the claim requires both sides, both the local side and the remote side. And there is no dispute from Unilock based on its briefs that if the claim requires both sides of the system, there is no direct infringement by Microsoft under cross-medical Microsoft means. That is why, if you get to Unilock's reply brief, they had to shift gears and for the first time in this case in six years of litigation, argue that the claim only requires the remote side. But your argument only applies to use claims. And this is not a method claim. This is a system claim. Microsoft sold the entire system. So they're selling? They're not making? They didn't make the whole system? Absolutely not, Your Honor. This claim requires two things that Microsoft absolutely doesn't make. The licensee unique ID generating means, which is a computer loaded with software. Microsoft makes the software. They don't make the computer. They don't load the software. And the second thing is the mode switching means, which is on the local machine and, again, does not exist until the software is loaded on the computer. This is, with all due respect, I think where Judge Smith got this piece of it wrong. He recognized consistently that Claim 19 requires both sides. The parties until the reply brief in this court recognized Claim 19 requires both sides. Nobody disputes that the user has to install, load the software in order to create the means. So regardless of whether you ever use the means... But doesn't the Claim 19 really only claim the remote part? It doesn't, Your Honor, for a number of reasons. Actually, one of the best... Mr. Scherkenbach, the LUID is an algorithm. An algorithm is something that you provided via the software in the Microsoft system. There's no means without... I mean, the algorithm, the software... It's an algorithm. It's a piece of software. It is not. You don't have the means for performing anything until that algorithm is loaded on a computer. I mean, this Court's own precedents actually emphasize that over and over and over again. You can look at, actually, even the fantasy sports case on which Unilock tries to rely, makes that very point forcefully, that, look, you've got the means once you have a software with the required algorithm that's loaded on the computer. That creates the means. Whether you have to then use the means in some way to satisfy the claim, that is the issue. Judge Smith disagreed that Claim 19 required a special kind of use. And that's neither here nor there, because we don't have to construe the claim as requiring use. It requires the means. Microsoft doesn't make the means. End of story. And just on this issue, to respond to your question, I find it ironic, actually, if you look at the verdict form, which is attached... A91 in the next few pages, the jury was asked, without objection, to find whether each of these elements was present in the Microsoft Accused system. And all of the elements are there. Remote, local, mode switching means it's all there. Unilock had no objection to that verdict form. This has never been an issue in the case until appeal. And, you know, what were we doing here? Tilting and windmills, asking the jury to find things that they didn't have to find. No, the answer's no. If we want to step through the intrinsic evidence, it's equally clear. The specification makes clear every embodiment requires both sides. Unilock argued in prosecution to distinguish its invention from the prior art, that the invention, including Claim 19, requires both sides. The court can look at Appendix 8025, Appendix 8027-28 for that. It's crystal clear they distinguished the prior art on the basis of the prior art not having a, among other things, a licensee unique ID with local generating means. So this issue is dispositive. And it allows the court, actually, to dispose of the case without reading into the other details. That said, I was going to go on to summation. Some of the questions of the court are directed to this. First of all, Judge Rader, I think to respond to your question, which you asked at the outset to Mr. Gunner, is there some tension between whether somebody of skill in the art would look at this and say there is no way that these hashes are addition algorithms. There's just no way. And on the one hand, you have a lay juror reaching the opposite conclusion. And I actually think, at least in the facts of this case, that the tension is not presented. Because this is a case where their own expert never opined that these hashes were summation algorithms. He never opined or testified. But there were documents from you describing it as a summation. Well, yeah, that's the wording piece of the case, as described by Judge Smith, that really, in the end, Unilak's case came down to two things. Number one, they said they took the judge's claim construction and labeled the judge used to describe what was disclosed. And there's no dispute, the only thing disclosed in the patent is an algorithm that combines the inputs by addition. Adding the inputs by addition, Judge Murray pointed out figure 9. The judge said, that's the only thing that's disclosed, that's the corresponding structure, and he labeled it summation algorithm. The word summation doesn't appear in this patent. Sum appears, summer appears, summation doesn't appear. So the judge gives it a label, everybody knows what the judge is talking about. Unilak, during claim construction, never dreamed of arguing that summation meant something other than adding these inputs themselves up. You look at their claim construction briefing, you won't see anything like that. But their argument is that's what the hash algorithm does, is it adds a bunch of input. It's argument, Your Honor, yes, but it's only argument. But where I was getting was, Mr. Klausner never said, because it's not true, that the hash algorithms add the inputs to the algorithm. They don't. But Microsoft's own documents, Judge Rader pointed out to you, Microsoft's own documents define the hash algorithm, giving the example of the very algorithms that issue in this case, as summation algorithms, summers or checksums, and your expert, when he testified, each of these was presented to him on cross-examination, and in each case, he said that he disagreed with those Microsoft definitions. He disagreed with the interpretation of the documents given by the lawyers in their cross-examination. These are documents, there are some Microsoft documents. Counsel, question. And you disagree with Microsoft's definition of hash as used in its own dictionary. That's not an interpretation, that's did you disagree, that's the question, and you disagree with Microsoft's definition of hash as used in its own dictionary. That question involves no interpretation. It does, because the lawyer put a gloss on that question when he asked the witness. When he asked the witness, if this document shows X, are you saying you disagree with the fact that the document says X? That's not what the question says. There's no preceding part I alluded, that I omitted, or following part. The more fundamental point is, my answer to your question is yes. If we're in a world where plaintiffs can prove infringement of an extremely technical subject matter by doing a Google search, which is essentially what Unilat's presentation at trial was. They got a few high-level Microsoft documents that had SUM somewhere, some, somewhere in it. The rest of the documents they found by Google search. This NCR patent was a result of a Google search and a few other things. And their own expert doesn't opine on those documents, doesn't say what they mean. Our experts and technical witnesses disagree with the gloss placed on them, and they use them in cross-examination and put them in the record and say, well, the word is the same. The word is the same, therefore infringement. Why don't all these documents, including another patent, which says the message hash is represented by a summation algorithm, blah, blah, blah. It says it quite exactly. Why aren't these all evidence that one of skill in the art would view these hash algorithms as summation algorithms? However that is defined, that is how one of skill in the art would view them, or at least enough evidence to substantiate the jury verdict. The short answer is none of the documents has any bearing to the claim construction that applies in the case. I mean, this court, we've been down this path before. Markman was a case where there were documents describing the accused system as an inventory control system. And the plaintiff said, well, we're done. The claim requires an inventory control system. Your documents say inventory. You know, end of story. And the courts, not only did the courts say no, summary judgment was affirmed in that case for the defendant. And this is not a word game. I mean, these issues, you can't resolve these issues with respect to plain words. This is not an issue of claim construction, right? Because I don't understand them to be appealing claim construction. The district court's claim construction was summation algorithm. And unless I'm mistaken, I understand that Mr. Dunner hasn't appealed that. Is that right? Well, I think that's true. At one level, they have not formally appealed the claim construction. But their argument is that, in fact, Judge Smith changed his claim construction in a meaningful way between the time of the claim construction proceedings and the time he instructed the jury. And that didn't happen. Well, I thought they were complaining about  to the simple addition language. I mean, that certainly is not present in the claim construction he issued or was ever in any instruction to the jury. The jury was informed that it's a summation algorithm. Well, that's true. That's true. And, I mean, they are complaining about the application piece as well. I don't mean to deny that. But, in effect, again, to go back to the point I started with, Unilock very much wants the court, this court, to put a gloss on the word summation algorithm that is much broader than what's disclosed in the specification. Mr. Schurkenbach, the Unilock's expert testifies that they're combining three binary operations into a single binary code. Why couldn't the jury reasonably say that that combination is an addition? Well, that combination might be an addition. It's done by logic operations. We all know that. It's very clear it's done by logic operations, not by addition. But why couldn't the jury conclude that it is a summation? They could conclude it's an addition of something. They could not conclude it's a summation algorithm for at least two reasons. Number one, there is no evidence in this record that the inputs to the algorithm, the inputs to the hashes, are combined by addition. They aren't. What Mr. Klausner testified to is that in an intermediate portion of this incredibly complicated hashing algorithm, there are pieces of data that are added. Those pieces are not the inputs. All the compressive functions, there's three pieces, there's compressive functions, shifting, and mixing. The District Court found this without contradiction. It was explained at great length by Dr. Wallach. All the compressive functions happen first. Then comes the shifting, which Mr. Klausner says is addition. Sure, it's addition of something. It's not addition of the inputs to the algorithm, which is the only thing shown in the pattern. That's the first response. Come back to your point, there's no evidence because that's almost what we have to find, isn't it? What is there no evidence of? There's no evidence that the algorithm overall, the algorithm that they say produces the licensing unique ID, that that is a summation algorithm in the sense of adding inputs together. Mr. Klausner never said that that's not the way it works. There's no evidence in this record that that's the way it works. We pointed out this is an important legal issue. They can't look at the whole algorithm that produces the loop and focus only on a piece of it and say because that piece adds something, then we've got a whole corresponding structure that produces in this case the loop and compare that to the corresponding structure in the path. And if you do that, there's no way anyone can come out the other way and Judge Smith was convinced of that in spades. So on summation, I think those are the key points. If the court has nothing further on that, I'll go on to one other issue that I'd like to address, and that is what I would call the license issue. This is another independent reason that Judge Smith found that JMOL was appropriate, and that is there's no registration system use mode because in the Microsoft system a person becomes a licensed user independent of the patent and having nothing to do with product activation itself. And in the briefs this issue boiled down to whether the license referred to in the claim construction is the legal license or something else. And a couple of points on that. First of all, the only license referred to in the patent is the legal license. We have made that point. I actually don't understand you a lot to have disputed it. In all the briefing at the end of the day the only disclosure in the patent of the license that matters is the legal license. Now, to remind you that the legal license in this case requires and provides access to  updates and upgrades. And that doesn't occur until activation occurs here. So until activation occurs in the Microsoft office, the only disclosure in the patent is the legal license. And that requires looking at an arbitrary point in time under the license agreement. And that requires looking at when you have full use of all the licensed features that you have in the patent. And that requires  an   time under the license agreement. And that requires looking at when you have full use of all the licensed features that you have in the patent. Now, the patent does  have full use. And that access doesn't come until you activate. So why isn't that the point in time at which you have full use? Because with all due respect, it's totally arbitrary, right? I mean, you can't install an unlimited number of computers. But that's not what you're given as part of the license. The license here doesn't say any computer you want. I mean, the license does say  that. So, again, if you have a product for which there are no updates or upgrades, which, I mean, the record isn't clear on this one way or the other, by the way, there's no evidence that any of these products have upgrades or improvements to  product. So, again, the license doesn't say anything about the upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the  or the   the     upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the upgrade    upgrade        upgrade or the upgrade  upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the upgrade or the upgrade  or the upgrade or the upgrade upgrade or the upgrade or the upgrade or the upgrade      upgrade or the  or the upgrade or the upgrade or the upgrade the upgrade or the upgrade the upgrade or the upgrade the upgrade or the upgrade or the upgrade the upgrade android ray or the upgrade the upgrade the upgrade the upgrade the upgrade the update the upgrade the update the upgrade upgrade the upgrade the of the upgrade the upgrade the upgrade of the upgrade the upgrade the upgrade of the upgrade of the upgrade the upgrade of the upgrade the upgrade of the the record, it says $85. If you took $2.50 as a percentage of that, it's 2.9%. The Lucid versus Gateway says you can use total revenues as long as your percentage is reasonable. And the witness talked about typical royalty rate, as you pointed out, being 9%, 10%, 11%. So certainly it meets that test. Secondly, the judge told the jury, you may, however, consider revenue Microsoft may have obtained as a result of product activation. And on his objection to the entire market value rule, he said at page A3184, you can challenge the so-called sanity check. So there are all kinds of things here where the judge let them do certain things. There was no objection to the pie charts, which talked about the 19 plus billion. And the First Circuit has a very rigid rule about objecting if you're going to rely on a new trial argument. Now, as to the muni auction issue, which Mr. Schorkenbach talked about, this claim clearly, as Judge Rader pointed out, is not to a health system. It's to a remote registration station. And they use the system as the environment for defining what that is. And I believe it may have been the BMC case. It may have been the muni auction case, which said there are ways to write a claim so that you don't impact on the whole system. And that's exactly what they did. BMC. BMC. In the yellow brief at 25, we cite from Wall v. Williams, a Supreme Court case, which basically says that it's hard to write a claim to a component without talking about the environment. That's all this does. The judge also went beyond that. He relied on NTP talking about control and beneficial use. And then he talked about the mastermind rule from the BMC case. So much for that. As to the license issue and the question of the registration system and whether you need a legal license, that is out of the sky. I don't know how the judge picked that up. The patent doesn't talk about a legal license. We have figures 2A to C in which we do the same thing Microsoft does. You approve the agreement at an early stage. You pay for it at an early stage. It doesn't happen until later that you get full use. And I'm sure you're exactly right. Thank you, Mr. Jenner. Thank you. Our next